NOTICE
Decision filed 06/25/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250053-U

NO. 5-25-0053

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| BRIAN A. KREPS, | ) | White County. |
| | ) | |
|     Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 21-D-39 |
| | ) | |
| ASHLEY B. KREPS, n/k/a Ashley B. Birdwell, | ) | Honorable |
| | ) | Thomas J. Dinn III, |
|     Respondent-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Moore and Boie concurred in the judgment.

**ORDER**

¶ 1      *Held*:   Where the trial court failed to make factual findings in support of its determination to deny a petition to relocate and grant a petition to modify parental responsibilities, we reverse and remand.

¶ 2      Following the entry of an agreed judgment for dissolution and incorporated parenting plan, respondent, Ashley B. Kreps, n/k/a Ashley B. Birdwell (Ashley), filed a petition to relocate. The petitioner, Brian A. Kreps (Brian), objected and filed a petition to modify parental responsibilities. After a two-day bench trial, the trial court denied Ashley's relocation petition and granted Brian's modification petition. For the following reasons, we reverse the trial court's orders and remand with directions.

1

¶ 3                                I. BACKGROUND

¶ 4     Petitioner, Brian A. Kreps (Brian), and respondent, Ashley B. Kreps (Ashley), were married on January 26, 2012. They had one child, Owen Kristopher Kreps (Owen), D.O.B. 8/10/2016. On August 10, 2021, an agreed judgment of dissolution was entered. The judgment included an agreed parenting plan, in which the parties shared all significant decision-making responsibilities. Brian had weekly parenting time from 4 p.m. until 8 p.m. and alternating weekends from 6 p.m. on Friday until 6 p.m. on Sunday. Each party was given three weeks of parenting time in the summer, plus an alternating holiday visitation schedule. Ashley was designated as the parent with the majority of the parenting time, and Brian's home was designated as Owen's residential address for the purpose of school enrollment. Additionally, any parent asking to relocate was required to provide 60 days advance notice to the other parent and state the proposed moving date and new address.

¶ 5     On February 7, 2022, Ashley filed a petition to modify parenting time. Ashley sought to decrease Brian's weekly parenting time, alleging: (1) Brian was not assisting Owen with his "basic scholastic skills"; (2) because Owen gets home after 8 p.m. every weeknight his sleep is "negatively impacted"; (3) Brian "frequently does not exercise days of his weekly *** parenting time"; (4) Brian took a week-long vacation to Georgia; and (5) Brian has made efforts to alienate Owen from Ashley and "upon information and belief" he "instructed the minor child not to converse with" Ashley's current or any future "paramour."

¶ 6     On May 25, 2022, Brian filed a verified petition for abuse of allocated parenting time alleging that on many occasions Ashley withheld parenting time based upon her position that Brian's weekly parenting time ended at 6 p.m. instead of 8 p.m. In Brian's petition, he alleged

2

Ashley made the following statements as he was attempting to exercise his parenting time with Owen:

1. "Good, I want child support.

2. Money is not an issue for [Ashley]. 'This can continue for years' and [Ashley] hopes Brian has the money to pay his lawyer because Ashley will have Brian in court 'every year for the next thirteen years.'

3. Brian owed her a lot of [makeup] time, and '[i]t's clear you know your paperwork is shit. If I was you, I wouldn't want a judge to see it either.'

4. Brian should not waste his gas to drive over and pick up [Owen] and that Brian should be saving his money for a lawyer and court."

On June 10, 2022, Ashley filed a verified response to Brian's petition, in which she admitted to making these comments.

¶ 7   On August 17, 2022, Ashley filed a verified amended petition to modify parenting time, which contained the same allegations in her February 7, 2022, petition, adding the following: Brian's father, Alan Kreps, "regularly hits [Owen] in the head with a closed fist," Owen is afraid of Alan, and Barbara Kreps (Alan's wife and Brian's mother) admitted she was aware of Alan striking Owen in the head. Ashley sought to reduce Brian's parenting time and prevent Alan from babysitting Owen.

¶ 8   On May 31, 2024, the court-appointed guardian *ad litem* (GAL) filed a report stating: "It appears in relation to the pending Petition and Motion before the Court, that the best interests of Owen are to continue the current schedule."

¶ 9   On June 5, 2024, Ashley filed a notice of intent to relocate, stating her intent to move to Evansville, Indiana, and marry her fiancé, William "Brian" Birdwell on July 5, 2024. She also

stated she received a job offer from an elementary school in Evansville. Brian filed his objection on June 7, 2024.

¶ 10    On June 14, 2024, Ahsley filed a petition seeking permission to relocate pursuant to section 609.2 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/609.2 (West 2022)), which basically mirrored her June 5, 2024, notice of intent to relocate. On July 5, 2024, Brian filed an objection to Ashley's petition to relocate.

¶ 11    On August 9, 2024, Ashley filed an emergency petition to address school issues, stating she had "been required to relocate to Evansville, Indiana," and since "school starts in Illinois next week," the court needed to rule on where Owen should be enrolled. On August 13, 2024, Brian filed an answer to Ashley's emergency petition, stating that Ashley had already enrolled Owen in school in Indiana, where he was now attending. On the same date, Brian filed a petition, seeking *inter alia*, a mandatory injunction compelling Ashley to return Owen to Illinois, unenroll Owen from school in Indiana, and to enroll Owen in school in Illinois. Brian also sought an emergency modification of the agreed parenting plan, seeking to be awarded the majority of parenting time.

¶ 12    On August 20, 2024, the trial court made a docket entry stating: "RESPONDENT'S EMERGENCY PETITION TO ADDRESS SCHOOL AND PETITIONER'S TEMP RELIEF PETITION RESOLVED, ORDER TO ENTER ***." On September 16, 2024, the trial court entered a temporary order, which modified Ashley's parenting time to the first three weekends of each month, from Friday at 6 p.m. to Sunday at 6 p.m., each Monday and Wednesday from 4:30 p.m. to 7 p.m., and Labor Day weekend. On December 6, 2024, the GAL filed his second report. On December 9 and 10, 2024, a final hearing was held.

¶ 13    At that hearing, Brian testified that after the divorce, he would pick up Owen from Ashley at 4 p.m., arriving at Brian's house between 4:20 and 4:30 p.m. After eating, Owen had free time

4

until 6 p.m., when he did homework until 7 p.m. Owen then showered, and Ashley or her mother (Cathy) would pick him up at 8 p.m. Brian has kept this routine in place since the divorce to provide structure that he thought would help Owen with his speech delay/communication issues.

¶ 14    Brian testified that shortly after the divorce, Ashley began keeping Owen from him. Ashley began taking the position that Brian's weekly parenting time ended at 6 p.m. instead of 8 p.m., as set forth in their agreed parenting plan. The most likely times Ashley denied Brian parenting time were Thursdays and Fridays. On the Thursday when there was no school the next day, Ashley would message Brian not to pick up Owen, but he went anyway. This happened frequently, mostly before Ashley's scheduled weekend parenting time.

¶ 15    Owen's current school morning routine begins at 4:30 a.m. when Brian drives him to Carmi to his parents' house (Barbara and Alan Kreps), where he arrives about 4:50 a.m. Brian puts Owen to sleep on the couch then leaves for work at Continental Tire in Mt. Vernon.

¶ 16    Owen's current after school routine starts when Brian gets him off the bus at about 3:20 p.m.; they go to Brian's house and Owen starts his chores. If it is one of Ashley's Monday or Wednesday parenting times or a Friday on one of Ashley's weekends, Owen goes with her. When he returns to Brian's house, he completes his homework and showers. Owen gets 10 hours of sleep before he goes to school.

¶ 17    Owen had speech therapy with Jenny Blankenberger (Jenny) in Carmi. Brian ensured Owen attended every session and picked him up at the end of each one. Brian assisted Owen with practicing home assignments sent by Jenny, which consisted of multi-syllabic words. Brian and Owen go hiking at state and local parks. Brian restricts Owen's time playing video games. Owen has a dog and plays with two friends who live down the street. Brian participates in scheduling

5

doctor visits with Owen and communicates with Ashley about those appointments and any prescribed medication, including the dosage.

¶ 18    Brian testified that at the time of trial Owen's speech had greatly improved, and he is now very outgoing and likes to talk. Brian communicates with Owen's teachers at Norris City-Omaha-Enfield Community Unit School (NCOE) through a mobile application called Class Dojo. Another mobile application called Teacher Ease notifies Brian every time something is graded.

¶ 19    Jenny testified that she is a speech and language pathologist and has known Owen since he was two years old. She provided speech therapy after the parties divorced. Brian scheduled most of the sessions. Jenny classified Owen as having a severe phonological inarticulation deficit that affects his speech. She was seeing Owen every other weekend for sessions lasting approximately 45 minutes. Brian was very involved with provided worksheets and recommended exercises for Owen to work on at home. According to Jenny, since the divorce, she had approximately 60 sessions with Owen, and he has progressed really well since August 2021.

¶ 20    The report filed by GAL Nathan Rowland on May 31, 2024, which was admitted into evidence, indicated that Owen attended Booth School in Enfield, Illinois, until it closed, and then he attended NCOE for the 2023-24 year. Regarding Ashley's allegation about physical abuse of Owen by Alan, the GAL was provided with a Department of Children and Family Services investigative file. The initial report was called in by Ashley and was later unfounded. When asked by the GAL about Alan, Owen did not express any specifics of being hit or being afraid of him. Regarding Ashley's allegation that Brian did not assist Owen with basic scholastic skills, the report noted that Ashley said Owen had "good grades," and Brian said Owen had "straight A's." The report noted: (1) Owen is doing well in school; (2) Owen is successfully managing the current 4 p.m. to 8 p.m. parenting time schedule with Brian; (3) Owen continues to progress well; (4) Owen

6

expresses no trouble with Alan Kreps; (5) Brian's schedule of 4 p.m. to 8 p.m. through the week has not impaired Owen's performance in school; (6) Owen stated he wants to live with mom; and (7) it is in Owen's best interest to continue the current schedule.

¶ 21    The GAL report filed December 6, 2024, was also admitted into evidence. In this report, the GAL highlighted the following: (1) Owen stated he got straight As in school, has friends he plays with, and provided a description of his morning and afternoon routine. On multiple occasions Owen responded to some questions with "Mom says," *i.e.*, "Mom says Dad says I'm a liar" and "Mom says Dad won't take me to the doctor." (2) Owen's school principal indicated Owen is a good student with no disciplinary problems and no issues of Owen being tired or sleepy. (3) Owen's school records reflected that Owen had A, B, and C grades in kindergarten for the 2022-23 school year and straight As since. There were six absences and no tardies over the entire time, with no absences or tardies since the September 16, 2024, temporary order has been in place. The GAL testified that he never heard Owen say "Dad says," and he had concerns about Ashley coaching Owen.

¶ 22    Barbara Kreps testified that Brian is her son, and her children, grandchildren, and great-grandchildren live in or near Carmi, Illinois. The family gathers at her home on major holidays, and they are very close. Barbara is a retired licensed practical nurse and helps Brian with Own since the divorce. She testified that Owen's speech problems have greatly improved, and he now reads well.

¶ 23    Barbara's routine with Owen on school mornings since August 2024 is as follows: Owen arrives at her house at about 4:50 a.m. when she puts him on the couch to sleep from about 5 a.m. to about 6:45 or 7 a.m. Barbara then wakes Owen, and he goes to the bathroom, puts away his toothpaste and towel, eats breakfast, and does chores. She and Owen leave Carmi at about 7:35

7

a.m., and she drives him to school. Owen has never had to finish homework before she takes him to school, and she has not seen Owen sleepy or tired.

¶ 24    Michael Brown testified that he drives a bus for the NCOE school system. Brian is his next-door neighbor, and he has observed a lot of interaction between Brian and Owen. Michael testified that in the past year and a half Owen's speech has dramatically improved so that they can now have a conversation. Owen is inquisitive, very bright, and interacts with people well. Michael said that Brian and Owen have great interaction, and if Brian is outside, then Owen is out jumping on the trampoline, playing basketball, or chasing chickens. He has seen Owen doing chores with Brian, including digging a trench across the backyard for a new satellite system. Michael was aware of Brian's structure with Owen, and that at 6 p.m. Owen must do homework, followed by a shower at 7 p.m. and bedtime at 8 p.m. Michael believed this structured environment contributed a lot to Owen's progress.

¶ 25    Ashley testified that she was married to William Birdwell (William) on July 5, 2024, and she now lives in Evansville, Indiana, approximately 50 miles from Carmi. She is employed at Lodge Community School in Evansville as a reading teacher for kindergarten-third grade and multi-language students. Her annual salary is $46,000. Ashley was previously a student teacher and was unemployed from January-August 2024. Before that she was a teacher at Norris City and did part-time tutoring. Before that, she was a teacher's aide at Booth Elementary School, where she assisted with special education for second-fifth grade and was paid an annual salary of $40,000. She applied for a teaching job in Indiana because the pay was better, and she was getting married.

¶ 26    Ashley testified that NCOE is on "academic warning," and Owen had received an "F" on a math test. She testified that Owen had behavior problems at Norris City. Owen is no longer on

8

an individualized education plan, and no special programs are needed for him. He is currently in an advanced math class at NCOE.

¶ 27  Ashley testified that she typically exercises parenting time at her mother's house in Carmi, where she and Owen lived from 2021 until she moved to Evansville in 2024. She said that she has seen Owen sleepy during her parenting time, including him falling asleep in the car on the way back to Brian's house.

¶ 28  Ashley testified that she met her current husband, William, in the fall of 2021. She introduced Owen to William about two months after they first met, and she and Owen would have overnights on some weekends at William's home in Evansville. William proposed marriage in April or May of 2024. William has custody of his three daughters: Abby, age 13; Ava, age 12; and Brea, age 10. Owen has a close relationship with his new step-sisters, who play together on the trampoline, in the pool, watch movies, camp, fish, and walk the dogs. William's daughters all attended West Terrace Elementary School and Perry Heights Middle School, and William is familiar with those schools. Ashley's mother, Cathy, has lived in Carmi for many years, and her sister, Sara, also lives in Carmi with her two children.

¶ 29  Ashley testified that her reasons for wanting Owen to live with her in Indiana are: (1) her home has more structure; (2) she wants Owen to be able to sleep in until 7:30 a.m.; (3) the school system he would be entering in Evansville is "great" compared to NCOE, which is on academic warning; (4) Owen has siblings to play with; and (5) Owen wants to live with her.

¶ 30  William testified that he is 44 years old, lives in Evansville, Indiana, and works for Danco Construction as a superintendent. He is required to be at his work site at 7 a.m., and his workday ends at 3:30 p.m. He has primary custody of his daughters. He lives in a three-bedroom home, where his daughters share a bedroom. Owen has his own room. William's home is less than five

9

minutes from West Terrace Elementary, where his children attended school. They now attend Perry Heights Middle School. He treats Owen the same as he does his daughters, and Owen seems like he interacts with them as if they were siblings. He testified that Ashley is amazing as a mother.

¶ 31 Cathy testified that she is Ashley's mother and has worked as a freight manager at Kingery & Associates for 26 years. Owen and Ashley lived with her for over three years, and she sees Owen now on Monday and Wednesday evenings when Ashley has parenting time. Owen is polite and smart. Cathy testified that since the change in parenting time under the temporary order, she has witnessed a change in Owen's behavior. He is now angry, quieter than usual, not as respectful, irritable, and more tired, sometimes falling asleep at her house. She testified that Owen does not seem happy. Cathy said Ashley is a great mom and even went back to school to get into the field of special education because of concerns she had about Owen.

¶ 32 Following the testimony and closing arguments by the attorneys, the trial court stated:

"THE COURT: All right. Thank you.

I hate these cases. I'll just tell you that right now. Hate them. I've got two good parents, and it's an all-or-nothing gambit. But the only thing that could make this worse is if somebody was moving across the country, which I've encountered before. That's, quite possibly, the worse [*sic*] thing I've had to deal with in family court. I take these very seriously.

Most family cases, divorce cases, I try to rule from the bench so everybody knows where they're at when they leave the courtroom.

I feel like I need to think about this, because, again, this is a—huge decision. One person wins. One person loses."

10

¶ 33    On January 9, 2025, the trial court entered an order using the parenting plan form approved by the Illinois Supreme Court, which basically adopted Brian's proposal. The order denied Ashley's petition to relocate and granted Brian's petition to modify parenting time. Ashley filed a timely appeal.

¶ 34                                                    II. ANALYSIS

¶ 35    Section 609.2 of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/609.2 (West 2022)) governs a parent's relocation. Section 609.2(g) provides:

"The court shall modify the parenting plan or allocation judgment in accordance with the child's best interests. The court shall consider the following factors:

(1) the circumstances and reasons for the intended relocation;

(2) the reasons, if any, why a parent is objecting to the intended relocation;

(3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;

(4) the educational opportunities for the child at the existing location and at the proposed new location;

(5) the presence or absence of extended family at the existing location and at the proposed new location;

(6) the anticipated impact of the relocation on the child;

(7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;

11

(8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests." *Id.* § 609.2(g).

Additionally, section 609.2(d) provides: "The court may consider a parent's failure to comply with the notice requirements of this Section without good cause *** as a factor in determining whether the parent's relocation is in good faith ***." *Id.* § 609.2(d).

¶ 36 The manifest weight standard of review is applicable to orders granting or denying a petition to relocate a minor child from the state. *In re Marriage of Fatkin*, 2019 IL 123602, ¶ 32; *In re Marriage of Collingbourne*, 204 Ill. 2d 498, 535-36 (2003). A factual finding is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 70; *Vancura v. Katris*, 238 Ill. 2d 352 (2010). Stated another way, a factual finding is against the manifest weight of the evidence only when, after viewing the evidence in the light most favorable to the determination at issue, the reviewing court concludes that no rational trier of fact could have made the same finding. *Briggs v. State*, 323 Ill. App. 3d 612, 618 (2001); see also *Durand v. Industrial Comm'n*, 224 Ill. 2d 53, 64 (2006).

¶ 37 The mere fact that an opposite conclusion is reasonable or that the reviewing court might, as the trier of fact, have reached a different conclusion based upon the same evidence does not justify a reversal of a factual determination made by the underlying fact finder. *Marconi v. Chicago*

12

*Heights Police Pension Board*, 225 Ill. 2d 497, 534 (2006). The reviewing court does not reweigh the evidence or substitute its judgment for that of the trier of fact. *Board of Education of City of Chicago v. Illinois Education Labor Relations Board*, 2015 IL 118043, ¶ 15. The reviewing court's function is limited to ascertaining whether the factual findings at issue are against the manifest weight of the evidence. *Id.*

¶ 38    The trial court's order did not include any findings of fact, save one: "I've got two good parents." At the conclusion of the bench trial, after the trial court told the attorneys it wanted them to submit parenting plan proposals, the court was asked by Ashley's counsel, "Would you like any findings in that or just the straight Parenting Plan proposal?" The court responded, "Just straight Parenting Plan." It is impossible for us, as a reviewing court, to ascertain whether the factual findings at issue are against the manifest weight of the evidence when there are none. The trial court's docket entry order of January 7, 2025, that it considered "the statutory considerations" is not a substitute for findings of fact upon which to support its ultimate determination to deny the relocation petition and grant the petition to modify parenting time. Accordingly, we reverse the trial court's orders and remand this case with directions to the trial court to make factual findings in support of its orders.

¶ 39                                III. CONCLUSION

¶ 40    Because the trial court failed to make any required factual findings, we reverse the trial court's orders and remand with directions.


¶ 41    Reversed and remanded with directions.

13